**MO–KAN TEAMSTERS PENSION FUND, a trust fund, and Mo-Kan Teamsters Health & Welfare Fund, a trust fund, Plaintiffs-Appellees,**

v.

**Robert J. CREASON, d/b/a Kansas Cartage Company, Defendant-Appellant.**

**No. 81–1671.**

United States Court of Appeals, Tenth Circuit.

Sept. 6, 1983.

Certiorari Denied Jan. 9, 1984. See 104 S.Ct. 716.

Susan Ellmaker of Gates & Clyde, Overland Park, Kan., for defendant-appellant.

Michael C. Arnold of Yonke, Shackelford & Arnold, P.C., Kansas City, Mo. (Albert J. Yonke, Kansas City, Mo., with him on brief; George A. Groneman, Kansas City, Kan., also on brief), for plaintiffs-appellees.

Before BARRETT, McKAY and SEYMOUR, Circuit Judges.

SEYMOUR, Circuit Judge.

This is an action brought under section 301 of the Labor Management Relations Act, 29 U.S.C. § 185 (1976), and section 502 of the Employee Retirement Income Security Act of 1974, 29 U.S.C. § 1132 (1976 & Supp. V 1981). Defendant Robert J. Creason appeals from the district court's order awarding plaintiffs Mo-Kan Teamsters Pension Fund and Mo-Kan Teamsters Health and Welfare Fund (the Funds) delinquent fringe benefit contributions, with interest, audit costs, and attorney's fees. He alleges that the trial court erred in (1) finding that he executed a contract stipulation; (2) failing to find the stipulation unenforceable as a prehire agreement; (3) finding that his obligation did not terminate; (4) rejecting certain parol evidence; and (5) basing the measure of damages on the results of an audit submitted by plaintiffs. We affirm.

## I.

## EXECUTION OF CONTRACT STIPULATION

### A. Factual Background

Creason owns and operates Kansas Cartage Company, a trucking firm. The plaintiff trust funds were established in 1969 pursuant to a collective bargaining agreement between the Builders' Association of Kansas City, Missouri (Builders' Association) and Local Union No. 541 of the International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers (Union). Although Creason has never been a member of the Builders' Association, the Union placed a picket on Creason's business on March 14, 1971, to protest his refusal to make payments into the Funds. The next day Creason met with Karl Rogers, who is the president and a business representative of the Union and a trustee of both Funds.

From this point the facts are hotly disputed. Plaintiffs' witnesses testified that Creason executed the following contract stipulation:

"TEAMSTERS LOCAL UNION 541
CONTRACT STIPULATION

"The undersigned employer acknowledging receipt of a copy of the Collective Bargaining Agreement presently in effect between the Builders' Association of Kansas City and Local Union 541, affiliated with the International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers, and after negotiation and a complete discussion of the facts and circumstances involved and desiring and intending to be bound by the prevailing wages and conditions in the area, hereby agrees with the Union to be bound by the terms of such collective bargaining agreement, subsequent collective bargaining agreements, all fringe benefit agreements, welfare and pension plan trusts, all rules and regulations adopted by the Trustees of the aforementioned Trusts, and all other legal agreements between the aforementioned parties and any renewals, modifications, or extensions thereof for the duration of all said agreements. This stipulation which expressly applies to each and every term of the above agreements, shall be valid and effective when approved by the union and the proper undersigned Board of Trustees and shall remain in effect until five years from this date and thereafter shall automatically renew itself for a three-year period and at regular three-year intervals thereafter, unless either the employer or the union gives written notice of desire to terminate to the other party and to the association, no more than 90 days and no less than 60 days prior to any such three-year anniversary date. Dated at 3–15–71, this ____ day of _____ 19___."

Rec., vol. III, at 413. The stipulation was signed and dated by Karl Rogers. Creason allegedly also signed the document. He disputed this at trial, however, testifying, "[i]t appears to be my signature but I did not sign this document." Rec., vol. XI, at 322. He said that he did sign two copies of the Builders' Association collective bargaining agreement with the words "under protest," and took an unsigned copy back to his office. However, he failed to produce either of the allegedly signed copies of this agreement.

The Funds introduced considerable evidence controverting Creason's position. Rogers testified that there would have been no reason for Creason to sign the Builders' Association contract. Additionally, the Funds produced several other documents purportedly signed by Creason. Creason conceded that all but one of the signatures appeared to be his, but he would neither deny nor affirm them as his. He did, however, acknowledge one signature as his own, a notarized signature on a document from other litigation. He conceded that this authenticated signature "appear[ed] to be the same" as the others, including the disputed one on the stipulation. Rec., vol. XI, at 343.

The parties agree that Creason submitted monthly remittance reports and made payments to the Funds from March 1971 to December 1976. Their explanations differ, however. Creason's position is that the payments were only for work done on the Crown Center project, in accordance with a purported oral agreement with Rogers. The Funds insist that he was bound by the contract stipulation to make payments for all covered workers, and they seek the delinquent amount.

### B. Discussion

Creason contends the district court erred in finding that he executed the stipulation. Initially, we note that a district court's findings of fact may be overturned on appeal only if they are clearly erroneous. Fed.R.Civ.P. 52(a). " 'When a case is tried to the district court, the resolution of conflicting evidence and the determination of credibility are matters particularly within the province of the trial judge who heard and observed the demeanor of the witnesses.' " *Equal Employment Opportunity Commission v. Central Kansas Medical Center,* 705 F.2d 1270, 1274 (10th Cir.1983) (quoting *Dowell v. United States,* 553 F.2d 1233, 1235 (10th Cir.1977)).

■ On appeal, Creason suggests that the trial court should not have considered

the other signatures offered. He relies on a line of early Iowa cases discussed in *Cousin v. Cousin,* 192 F.2d 377 (8th Cir.1951). *Cousin,* however, is limited to Iowa law, and is neither controlling nor persuasive. Rule 901(b)(3) of the Federal Rules of Evidence allows triers of fact to authenticate writings by comparing them with authenticated specimens. The trial court's use of plaintiffs' exhibits was entirely proper. *See generally* 5 J. Weinstein & M. Berger, *Weinstein's Evidence* ¶¶ 901(b)(3)[02]–[03] (1982). Despite Creason's testimony to the contrary, there was sufficient evidence to conclude that he did in fact sign the stipulation. The court's finding is not clearly erroneous.

## II.

### PREHIRE AGREEMENT

Creason argues that the contract stipulation is unenforceable as a prehire agreement entered into without majority support for the Union. Such prehire agreements have been authorized only in the building and construction industry. National Labor Relations Act § 8(f), 29 U.S.C. § 158(f) (1976).

> "By authorizing so-called 'prehire' agreements ..., § 8(f) ... exempts construction industry employers and unions from the general rule precluding a union and an employer from signing 'a collective-bargaining agreement recognizing the union as the exclusive bargaining representative when in fact only a minority of the employees have authorized the union to represent their interests.'"

*Jim McNeff, Inc. v. Todd,* —— U.S. ——, 103 S.Ct. 1753, 1756, 75 L.Ed.2d 830 (1983) (quoting *NLRB v. Local Union No. 103, International Association of Bridge, Structural & Ornamental Iron Workers (Higdon),* 434 U.S. 335, 344, 98 S.Ct. 651, 657, 54 L.Ed.2d 586 (1978)).

■ The district court found that Creason was not an employer in the building and construction industry, but it also found that the stipulation was not a prehire agreement. Rather, it held the stipulation to be

"a contract in which defendant voluntarily recognized the desire of a majority of his current employees to be represented by Teamsters Local No. 541." Rec., vol. II, at 227. The district court's finding that Creason voluntarily recognized the Union is not clearly erroneous. Consequently, "a presumption was created that a majority of the employees desired Union representation." *Arco Electric Co. v. NLRB,* 618 F.2d 698, 700 (10th Cir.1980).

■ If Creason believed that the Union did not represent a majority of his employees, his proper recourse was before the NLRB. Lack of majority status can only be challenged in an unfair labor practice proceeding, over which the NLRB has exclusive jurisdiction. *New Mexico District Council of Carpenters v. Mayhew Co.,* 664 F.2d 215, 217 (10th Cir.1981). It is not a valid defense to a section 301 action for enforcement of accrued contractual obligations. *Jim McNeff,* 103 S.Ct. at 1758–59; *Mayhew,* 664 F.2d at 219–20.

Creason argues that under certain circumstances an employer can assert the illegality of a promise as a defense to a section 301 action. *See Kaiser Steel Corp. v. Mullins,* 455 U.S. 72, 102 S.Ct. 851, 70 L.Ed.2d 833 (1982). However, *Kaiser Steel* is not controlling in this case. Unlike the asserted lack of majority status raised here, the hot cargo clause involved in that case was clearly an illegal promise *as well as* an unfair labor practice. *See* National Labor Relations Act § 8(e), 29 U.S.C. § 158(e) (1976). The Court did not disturb "the general rule [that] federal courts do not have jurisdiction over activity which 'is arguably subject to § 7 or § 8 of the [NLRA],' and they 'must defer to the exclusive competence of the National Labor Relations Board.'" *Kaiser Steel,* 455 U.S. at 83, 102 S.Ct. at 859 (quoting *San Diego Building Trades Council v. Garmon,* 359 U.S. 236, 245, 79 S.Ct. 773, 779–780, 3 L.Ed.2d 775 (1959)). The Court's unanimous decision in *Jim McNeff* makes clear that lack of majority status may not be asserted as a defense in a section 301 enforcement action.

## III.

### TERMINATION OF OBLIGATION

Creason contends that his obligation under the stipulation terminated upon expiration of the Builders' Association collective bargaining agreement in effect at the time of the stipulation. The stipulation by its terms binds Creason to "all other legal agreements between [the Union and the Builders' Association] and any renewals, modifications, or extensions thereof for the duration of all said agreements." Rec., vol. III, at 413. Creason argues that his obligation terminated March 31, 1974, because the collective bargaining agreement expired at that time and a new one did not become effective until May 1, 1974.

Creason also asserts that the trial court erred in holding that a letter sent by his attorneys to the Union and the Funds on January 24, 1977, did not terminate his obligation. The letter stated:

"[T]o the extent anyone believes that Robert J. Creason or Kansas Cartage Company is bound to the Joint Agreement between the Builders Association of Kansas City, Missouri, and Local Union No. 541, pursuant to Article XIV of the Joint Agreement presently in effect, please be advised that Mr. Creason and Kansas Cartage Company hereby give written notice of the Joint Agreement which is presently in effect until March 31, 1977."

Rec., supp. vol. I, at 5. The district court noted that the attempted termination would have been timely had Creason been a party to the agreement between the Builders' Association and the Union. It was not timely under the terms of the contract stipulation, however, which required notice of termination no more than ninety days and no less than sixty days prior to the anniversary dates in March 1976 and March 1979. Consequently, the district court held that Creason continued to be bound by the contract stipulation.

Creason argues that it is unfair to require him to decide over a year in advance of the expiration of the collective bargaining agreement whether to renew his participation, citing *Seymour v. Coughlin Co.*, 609 F.2d 346, 350 (9th Cir.1979), *cert. denied,* 446 U.S. 957, 100 S.Ct. 2929, 64 L.Ed.2d 816 (1980). In *Seymour,* the employer had executed a "short form" contract which substantially incorporated the terms of an agreement between a multi-employer bargaining unit and a union. The short form stated that it was effective for the term of the master agreement "and for any renewals or extensions thereof," but said nothing about modifications. *See id.* The trial court held that the employer was not bound by a subsequent, modified master agreement, even though the employer had continued to make payments. The Ninth Circuit declined to reverse the trial court's interpretation and findings.

The Ninth Circuit later made clear that no per se rule was announced in *Seymour. See Construction Teamsters Health & Welfare Trust v. Con Form Construction Corp.,* 657 F.2d 1101, 1103 (9th Cir.1981). *Con Form* involved a short form contract which, like the contract stipulation here, bound the employer to a master agreement and modifications thereof. The court stated "[i]t is clear that a signatory to a Short Form Agreement can agree to be bound by future modifications, extensions and renewals of [a Master Labor Agreement]." *Id.* at 1103. In upholding the trial court's determination that the employer continued to be bound, the Ninth Circuit noted that "[a]dditionally, we find Con Form's conduct in continuing to pay the pension trust through December of 1977 and in sending a letter of termination in April of 1978, further evidences the parties intent to be bound by subsequent MLAs unless written notice of termination was given." *Id.* at 1104.

We find *Con Form* persuasive in refuting both Creason's claim that his obligation terminated when the collective bargaining agreement lapsed in March 1974 and his claim that holding him to the termination provision of the contract stipulation would be unfair. Because Creason continued to make payments until December 1976, thus ratifying the new agreement, we need not address whether the thirty-day lapse in 1974 prevented the May 1 agreement from being a renewal, modification, or extension

of the earlier agreement. We likewise decline to reverse the district court's view of the contract stipulation's termination clause.

## IV.

### PAROL EVIDENCE

According to Creason, Rogers had assured him at the March 15 meeting that "he would not bother the rest of our operation if we would agree to pay into the health and welfare fund on the Ceco ... work at the Crown Center [construction site]." Rec., vol. XI, at 318. Rogers denied making such a promise.

Creason urges that the district court should not have rejected his evidence of oral representations by Rogers. He suggests the parol evidence should have been admitted to show that the contract was voidable due to mistake of fact. He argues that his testimony about Rogers assuring him he would only have to pay for employees involved with the Crown Center project is supported by the fact that "the *only* thing done pursuant to the master agreement was that money was paid into the funds on some of the employees." Brief for Appellant at 30.

■ A recent Ninth Circuit case is directly on point, and is dispositive of this contention. In *Waggoner v. Dallaire,* 649 F.2d 1362 (9th Cir.1981), the employer testified that a union business agent "promised not to enforce the terms of the agreement if [the employer] signed the 'short form' and agreed to adhere to the contract until he had finished the 'Thibado job,' a large construction project [the employer] was then undertaking." *Id.* at 1365. The district court held that the agreement was null and void because of fraud in the inducement. Discussing "the elaborate protection section 302 [of the LMRA, 29 U.S.C. § 186 (1976)] provides trust beneficiaries," *id.* at 1366, the Ninth Circuit reversed, holding "that an employer and a union may not orally modify the terms of employee trust provisions in a collective bargaining agreement." *Id.* (citing *Lewis v. Seanor Coal Co.,* 382 F.2d 437, 441–44 (3d Cir.1967), *cert. denied,* 390 U.S. 947, 88 S.Ct. 1035, 19 L.Ed.2d 1137

(1968)); *accord Maxwell v. Lucky Construction Co.,* 710 F.2d 1395 (9th Cir.1983). We agree with the reasoning in *Waggoner. See also Manning v. Wiscombe,* 498 F.2d 1311 (10th Cir.1974).

## V.

### MEASURE OF DAMAGES

The district court based damages on the results of an audit performed by an accountant from the Greater Kansas City Joint Construction Fringe Benefit Audit Program. Creason argues that the audit contained several significant errors and that the court's awards of damages were thus not supported by sufficient evidence.

The collective bargaining agreement required employers to pay a certain amount to each Fund for each hour a covered employee worked. Because Creason's business records had been stolen shortly before notice of the audit, records of hours worked were unavailable. The auditor therefore estimated hours worked by dividing gross wages (obtained from government records) by the hourly wage for pickup truck drivers. Creason argues that this method was inappropriate because his employees were paid on a percentage basis rather than an hourly wage. Additionally, he notes that the rate for pickup truck drivers was lower than other rates and that use of a lower rate would inflate hours. The trial court addressed these concerns reasonably, imposing awards in amounts five percent lower than those calculated by the auditor, rather than imposing the expense of a new audit on defendant.

Creason next argues that two employees should not have been included in the audit because they were supervisors. Yet Creason himself testified that these employees also performed covered work (deliveries, mechanic work) as well as some supervision. The record contains substantial evidence to support the conclusion that they were covered. Creason also contends that his employees performed work outside the geographical jurisdiction of the agreement, but he presented no evidence from which that fact could be determined. Finally, he suggests that the audit included the work of

employees who performed millwright work (installing equipment), which is not covered by the agreement. However, the auditor testified that she did not include millwrights, office workers, yard maintenance workers, and ground maintenance workers, based on Creason's answers to interrogatories about his employees' duties.

█ "When the cause and existence of damages have been established with the requisite certainty, recovery will not be denied because the amount of such damage is difficult of ascertainment. A reasonable basis for computation and the best evidence available under the circumstances is sufficient." *Thompson v. Kerr-McGee Refining Corp.,* 660 F.2d 1380, 1388 (10th Cir.1981). The district court did not err in using the results of the audit to assess damages.

We have considered Creason's other contentions and find them unpersuasive. Accordingly, the judgment is affirmed.