902 F.2d 1569
 Unpublished Disposition
NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
TRUSTEES OF ASBESTOS WORKERS LOCAL UNION NO. 25 INSURANCE
TRUST FUND, Pension Fund, Supplemental Unemployment Benefit
Trust Fund, Industry Advancement Fund and Apprenticeship
Fund, Plaintiffs-Appellants,
v.
METRO INSULATORS, INC. and Lee D. Johnson, jointly and
severally, Defendants-Appellees.
 No. 89-1656.
 United States Court of Appeals, Sixth Circuit.
 May 22, 1990.
 
 Before KEITH and MILBURN, Circuit Judges, and CELEBREZZE, Senior Circuit Judge.
 PER CURIAM:
 
 
 1
 Plaintiffs, Trustees of the Asbestos Workers Local Union No. 25 Trust Funds (collectively "plaintiffs"), sued defendants, Metro Insulators, Inc. ("Metro") and Lee D. Johnson ("Johnson") (collectively "defendants"), for unpaid fringe benefit contributions allegedly owed to the trust funds from June 1, 1982 through June 1, 1988. In its April 24, 1989 opinion and order, the district court held that after 1983, no collective bargaining agreement existed between the Asbestos Workers Local Union No. 25 (the "Union") and defendants; thus, defendants were not liable for any unpaid contributions. For the reasons set forth below, we REVERSE.
 
 I.
 A.
 
 2
 On December 21, 1987, plaintiffs initiated this action, requesting permission to audit the books and records of Metro, who had initially committed to contribute to the trust funds through a collective bargaining agreement with the Union. Plaintiffs allege that Metro and its sole shareholder, officer and director, Johnson, subsequently failed to make the requisite contributions to the trust funds. On February 1, 1988, defendants answered plaintiffs' complaint. Defendant's asserted that after June 1983, no collective bargaining agreement existed between Metro and the Union because Johnson orally notified the Union that Metro was ceasing its operations. Defendants contended that no contributions were due on behalf of Johnson, since he was not a Union member.
 
 
 3
 Johnson, acting in his individual capacity, filed a motion for summary judgment on July 29, 1988. The district court denied his motion on August 12, 1988. Plaintiffs filed, on August 12, 1988, a motion for summary judgment, seeking to audit Metro's books and to obtain a judgment against defendants for all unpaid contributions uncovered by the audit. On August 31, 1988, Johnson moved for rehearing on his summary judgment motion.
 
 
 4
 The district court held a final pre-trial conference on October 27, 1988. Without ruling upon the parties' summary judgment motions, the court set a trial date to determine: first, whether the collective bargaining agreement between defendants and the Union was in force during the time period that plaintiffs sought to audit Metro's books; and second, whether contributions to the trust funds are due on Johnson's behalf. On November 21 and 22, 1988, a two-day bench trial was held. On April 24, 1989, the district court issued an opinion and order finding that no collective bargaining agreement existed between the Union and the defendants during the contested time period; thus, defendants would not be required to pay additional fringe benefit contributions on behalf of Johnson. Judgment was entered for defendants.
 
 
 5
 Plaintiffs filed a timely notice of appeal with this court on May 24, 1989.
 
 B.
 
 6
 On July 19, 1982, Johnson, acting in his capacity as the sole officer, director and shareholder of Metro, executed an independent contractor's collective bargaining agreement (the "independent agreement") with the Union. The independent agreement bound Metro to the terms and conditions set forth in the Union's collective bargaining agreement with the Master Insulators Association of Detroit (the "association agreement"). The independent agreement contains a June 1, 1983 expiration date, with an automatic renewal provision that becomes effective immediately unless either party notifies the other in writing, at least 30 days prior to the anniversary of the contract's expiration date.
 
 
 7
 Defendants concede that, with the exception of one contribution report for February 1984, they have not made fringe benefit contributions to the trust funds since June 1983. Defendants further admit that Johnson has engaged in, and caused Metro to engage in, employment covered by the association agreement. Defendants also concede that they provided no written notice of their intent to terminate the independent agreement prior to April 20, 1988. Thus, defendants' written termination notice became effective on May 31, 1988.
 
 
 8
 Plaintiffs allege that defendants owe unpaid fringe benefit contributions to the trust funds for June 1, 1982 through June 1, 1988. During that time period, defendants were signatories--through the automatically renewed independent agreement--to the Union's 1982-1984, 1984-86, and 1986-89 association agreements. Each association agreement required signatory employers to make fringe benefit contributions to five trust funds, which provided the following programs or services: insurance, pensions, supplemental unemployment benefits, industry advancement and apprenticeship. Each association agreement also contained an audit provision which required signatory employers to submit their books and records for an audit by the plaintiffs to determine the accuracy of their fringe benefit contribution reports.
 
 
 9
 Although plaintiffs asked to audit Metro's books from June 1, 1982 through June 1, 1988, defendants refused their requests. Defendants argue that plaintiffs have no rights to audit Metro's books because Johnson orally terminated the independent agreement with the Union in June 1983. Defendants also contend that Johnson was not a Union member; thus, no contributions are due upon his behalf. To enforce their right to the audit, plaintiffs brought this action pursuant to Section 301 of the Labor Management Relations Act of 1947 ("LMRA"), 29 U.S.C. Sec. 185(a), and Section 502 of the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. Sec. 1132.
 
 II.
 A.
 
 10
 In Policy v. Powell Pressed Steel Co., 770 F.2d 609 (6th Cir.1985), cert. denied, 475 U.S. 1017 (1986), this court explained:
 
 
 11
 Contract interpretation is a question of law, not subject to the clearly erroneous standard. Chevron, U.S.A. v. Belco Petroleum Corp., 755 F.2d 1151, 1153-54 (5th Cir.1985). Thus, when reviewing the trial courts interpretation of a contract, an appellate court is not limited to the clearly erroneous rule, since a district judge's conclusions of law are freely reviewable by the court of appeals. Washington Metropolitan Area Transit Authority v. Mergentime Corp., 626 F.2d 959, 961 (D.C.Cir.1980).
 
 
 12
 Powell Pressed Steel Co., 770 F.2d at 612.
 
 B.
 
 13
 On appeal, defendants argue that because Johnson orally terminated the independent agreement that he signed on July 19, 1982, Metro owes no unpaid fringe benefit contributions to the trust funds. Plaintiffs contend that after the Union reached majority status in its bargaining unit, but before Johnson's alleged June 1983 oral termination, Metro's independent agreement matured into a fully binding collective bargaining agreement. Plaintiffs argue that as a matter of law, the independent agreement could not have been terminated by oral notice or subsequent conduct. We agree.
 
 
 14
 It is undisputed that defendants' written termination of the independent agreement was not issued until April 20, 1988. Thus, by its own terms, the contract was automatically renewed from its initial execution on July 19, 1982, until defendants' written notice of termination became effective on May 31, 1988. The independent agreement signed by Metro provides:
 
 
 15
 [T]he Employer further acknowledges that this [A]greement shall continue in effect until the first day of June, 1983 and that, either party hereto shall notify the other party, in writing, at least 30 days prior to June 1, 1983 or any succeeding anniversary date, any modification in its terms agreed to by the Asbestos Workers Local No. 25 and the Master Insulators Association of Detroit shall also apply to it, and the [A]greement, as modified, shall automatically renew itself until such time as the notice provided for herein is delivered by either party.
 
 
 16
 Joint Appendix at 126 (citing Plaintiffs' Trial Exhibit No. 3, Abestos Workers Local Union No. 25 Trust Funds v. Metro Insulators, Inc., No. 87-CV-74548-DT (E.D.Mich. Apr. 24, 1989)).
 
 
 17
 The district court recognized that the independent agreement provided for automatic rollover and written notice of termination. The district court held, however, that the independent agreement was a contract of indeterminate duration, and that after a reasonable lapse of time, it was justifiably terminated by defendants' unilateral action. See Joint Appendix at 20 (citing Abestos Workers Local Union No. 25 Trust Funds v. Metro Insulators, Inc., No. 87-CV-74548-DT, slip op. at 10 (E.D.Mich. Apr. 24, 1989)) (hereinafter "Opinion"). The district court concluded:
 
 
 18
 [B]ased upon the conduct of the parties, this court finds that the oral notice of termination was accepted and acted upon by the Union, and plaintiff Funds cannot now at this date claim that these defendants did not conform literally to the written termination requirements and therefore are still bound to the terms of the contract. In Boeing Airplane Co. v. NLRB, 174 F.2d 988 (D.C.Cir.1949), the court stated: "We agree with the principal of law that a contract of indeterminate duration may become terminable by the unilateral action on the part of either party after a reasonable lapse of time." Id. at 991.
 
 
 19
 Opinion at 9.
 
 
 20
 It is our view that the district court erroneously relied upon Boeing to conclude that the defendants' unilateral oral termination of the independent agreement was proper. In International Union of Operating Engineers v. Dahlem Construction Co., 193 F.2d 470 (6th Cir.1951), this court emphasized that a notice to terminate a labor contract must be clear and explicit. See id. at 475. We explained that the appellant derived no assistance from the Boeing Court, "for what [that] court actually held was that the contract could be terminated after proper notice...." Id. at 474. The Dahlem Court's conclusion severely undermines the district court's holding in the present case. When Johnson allegedly terminated the independent agreement by oral notice, he failed to give "proper notice" as mandated by the agreement's express terms requiring timely, written notice of termination. See id. at 474. Cf. Chattanooga Mailers Union Local No. 92 v. Chattanooga News-Free Press Co., 524 F.2d 1305, 1312 (6th Cir.1975) ("Both the language of the contract and the parties' intent, as manifested by past practice, are relevant in determining whether the contract [was terminated].") (emphasis added)).
 
 
 21
 Other circuits have also strictly interpreted the clear and explicit language of labor agreements. See, e.g., Irwin v. Carpenters Health & Welfare Trust Fund, 745 F.2d 553, 556 (9th Cir.1984) ("When ... clear and specific language in a labor agreement is at issue, federal courts are uniform in their strict interpretation of such language."). In NLRB v. R.J. Smith Construction Co., 545 F.2d 187 (D.C.Cir.1976), the court addressed a termination clause that required notice in writing at least three months prior to the expiration of the agreement and stated, " 'The time and manner of exercising a power of termination [of a contract] may be specified in the contract; in such case an attempt to exercise it otherwise will be ineffective.' " Id. at 192 (quoting 6 Corbin on Contracts, Sec. 1266, at 65 (2d ed. 1962) (emphasis added)). The Tenth Circuit applied the same strict construction approach in Mo-Kan Teamsters Pension Fund v. Creason, 716 F.2d 772 (10th Cir.1983), cert. denied, 464 U.S. 1045 (1984). In Mo-Kan, an employer executed a contract stipulation which contained an automatic renewal provision and bound the employer to the Teamsters' master collective bargaining agreement. The Tenth Circuit held that the employer was bound to the contract stipulation because he failed to provide the required written termination notice sixty days prior to the contract anniversary date. Mo-Kan, 716 F.2d at 776-77. Similarly, in Construction Teamsters Health & Welfare Trust v. Con Form Construction Corp., 657 F.2d 1101 (9th Cir.1981), the Ninth Circuit explained that an employer "signatory to a Short Form Agreement can agree to be bound by future modifications, extensions and renewals of [a Master Labor Agreement]." Id. at 1103. In affirming the district court judgment that the employer continued to be bound to the labor agreement, the Ninth Circuit found that "Con Form's conduct in continuing to pay the pension trust through December of 1977 and in sending a letter of termination in April of 1978, further evidences the parties intent to be bound by subsequent MLAs unless written notice of termination was given." Id. at 1104.
 
 
 22
 We find Con Form persuasive in rebutting defendants' claim that the independent agreement was terminated in 1983 by the conduct of the parties. Although Johnson testified that he did not sign subsequent independent agreements after 1982, by not doing so, he did allow the automatic renewal portion of the independent agreement to operate. Like the Con Form employer, Johnson did not issue a timely written termination notice, but waited until 1988 to issue such notice. See Con Form, 657 F.2d at 1104.
 
 
 23
 Significantly, other trial testimony supports the plaintiffs' belief that the association agreement continued to bind the defendants. Thomas Dyl, the Union's business agent, testified that he was not required to sign Metro to the 1986-89 association agreement because Metro was automatically bound by the 1982 independent agreement. Marvin G. Boullion, the Union's business manager, testified that Metro was not included on the Union's "fair contractor" list because Metro was cheating by using non-union employees, not because it did not remain under contract after 1983. Thus, we find that the conduct of the parties does not mitigate the significance of the undisputed fact that Johnson failed to provide a written termination notice according to the terms of the independent agreement until April 20, 1988. As a matter of law, we hold that Johnson's 1983 alleged oral termination of the independent agreement was ineffective. See, e.g., Irwin v. Carpenters Health & Welfare Trust Fund, 745 F.2d 553, 557 (9th Cir.1984) ("Judicial rewriting of labor contract terms that are clear in both the language used and situations addressed would undermine [the] private bargaining process which federal labor policy promotes.").
 
 C.
 
 24
 The district court determined that the independent agreement was terminated in 1983, but also suggested that the agreement did not require contributions on Johnson's behalf because he was the "owner" of Metro. On appeal, plaintiffs contend that employer contributions are due on behalf of union and non-union employees, even if they do not participate in the trust funds. Defendants respond that Johnson was the employer and had no duty to make contributions to the trust funds on his own behalf. We find plaintiffs' contentions to be persuasive.
 
 
 25
 This court had the opportunity to resolve a similar labor dispute in Teamsters Local 348 Health & Welfare Fund v. Kohn Beverage Co., 749 F.2d 315 (6th Cir.1984), cert. denied, 471 U.S. 1017 (1985):
 
 
 26
 This court has construed a definition of employees by job classification to require coverage by the collective bargaining agreement of all employees within those classifications, regardless of union membership.... The presence in an agreement of a recognition clause designating the union as the exclusive bargaining agent for all employees indicates that fringe benefit contributions are required for both union and non-union members.
 
 
 27
 Kohn Beverage Co., 749 F.2d at 318 (citations omitted).
 
 
 28
 In the present case, as in Kohn, the Union's association agreement mandates employer contributions for all job classifications outlined in the Union's craft jurisdiction. Because Metro became a signatory to the association agreement through the independent agreement, Johnson would be covered as an employee of Metro, regardless of whether he joined the Union. Under the terms of the independent agreement, when Johnson was performing "union" work or work covered under the association agreement, Metro owed fringe benefit contributions to the trust funds on behalf of Johnson. See id. at 318. Cf. Kroger Company v. N.L.R.B., 401 F.2d 682, 686 (6th Cir.1968) (conditioning fringe benefits solely on the basis of union membership violates Section 8 of the NLRA, 29 U.S.C. Sec. 158(a)(3)), cert. denied, 395 U.S. 904 (1969).
 
 
 29
 Although Johnson is the legal owner of Metro, he is not statutorily defined as an "employer." Section 3(5) of ERISA defines the term "employer" as "any person acting directly as an employer, or indirectly in the interest of an employer, in relation to an employee benefit plan; and includes a group or association of employers acting for an employer in such capacity." 29 U.S.C. Sec. 1002(5). This court has held that a sole shareholder and chief executive officer of a corporation was not an "employer" within the meaning of ERISA, 29 U.S.C. Sec. 1002(5). See Scarbrough v. Perez, 870 F.2d 1079, 1083 (6th Cir.1989) ("[W]here a court is without justification for piercing the veil separating a corporate employer from its owner-chief executive, the owner-executive may not be held personally answerable for the corporation's delinquent contributions."); International Brotherhood of Painters v. George A. Kracher, Inc., 856 F.2d 1546, 1550 (D.C.Cir.1988) (concluding that Congress did not intend to impose a personal liability on a shareholder or a high-ranking officer of a corporation for ERISA contributions owed by the corporation). Similarly, Johnson is not an "employer" for purposes of ERISA.
 
 
 30
 Under ERISA, the term "employee" is defined as any individual employed by an employer. See 29 U.S.C. Sec. 1002(6). To the extent that Johnson worked for Metro, he is an "employee" of the company. Thus, Metro, as a corporate entity, is Johnson's "employer." Metro erroneously maintains that an employer is not required to make contributions on its own behalf. Metro, however, was not required to contribute to the trust funds on its own account, but on the account of Johnson. See Kohn Beverage Co., 749 F.2d at 318. Accordingly, plaintiffs are entitled to all contributions due as a result of any work performed by Johnson or any other employee of Metro who engaged in "union work" or work covered by the association agreement.
 
 III.
 
 31
 If Metro had not used non-union employees for the covered work, the work would have been performed by Union members, and plaintiffs would have received the requested contributions. Since plaintiffs' financial stability depends on the total number of covered hours worked in the trade, Metro's actions deprived plaintiffs of a significant portion of their contribution base and negatively effected their ability to provide benefits to Union members. To prevent plaintiffs from being permanently deprived of the fringe benefit contributions owed to them by Metro, this court holds: first, that Metro's independent agreement with the Union was not terminated by Johnson's alleged oral termination in 1983; second, that fringe benefit contributions must now be paid on behalf of any Metro employees who engaged in covered employment, including Johnson; and third, that plaintiffs have a right to audit Metro's books for the time period of June 1, 1982 through June 1, 1988 to determine the amount of the unpaid contributions which are owed. For the foregoing reasons, we REVERSE the judgment of the district court and REMAND this case for further proceedings.