**PATTERN MAKERS' PENSION TRUST FUND, Plaintiff,**

v.

**BADGER PATTERN WORKS, INC., Defendant.**

No. 84 C 182.

United States District Court, N.D. Illinois, E.D.

July 22, 1985.

Jac Cotiguala, John Toomey, Arnold & Kadjan, Chicago, Ill., for plaintiff.

Gary A. Marsack, Larry R. Jakubowski, Lindner & Marsack, S.C., Milwaukee, Wis., for defendant.

## MEMORANDUM OPINION AND ORDER

SHADUR, District Judge.

Pattern Makers' Pension Trust Fund ("Trust") has sued Badger Pattern Works, Inc. ("Badger") under Employee Retirement Income Security Act ("ERISA") § 502, 29 U.S.C. § 1132, and National Labor Relations Act as amended ("NLRA") § 301, 29 U.S.C. § 185, to recover pension fund contributions Badger allegedly owes Trust. Now Trust has filed a Fed.R.Civ.P. ("Rule") 56 motion for partial summary judgment, and Badger has responded with a motion for summary judgment as to the entire Complaint. For the reasons stated in this memorandum opinion and order, both motions are granted in part and denied in part.

### Background [1]

Badger is a manufacturer of wood, metal and plastic patterns used by foundries. For many years it has employed workers represented by the Pattern Makers' League of North America, Pattern Makers' Association of Milwaukee and Vicinity

---

1. Rule 56 imposes on the party moving for summary judgment the burden of establishing the lack of a genuine issue of material fact. *Korf v. Ball State University,* 726 F.2d 1222, 1226 (7th Cir.1984). For that purpose the court must, in viewing the evidence, draw all reasonable inferences in the light most favorable to the nonmovant. *Hermes v. Hein,* 742 F.2d 350, 353 (7th Cir.1984). Where cross-motions have been filed, such inferences sometimes require a double factual perspective. In this case, though, there is no substantial dispute between the parties as to the facts, most of which are documentary. Accordingly the following recital reflects an undisputed view of the factual matrix for the current motions.

("Union"). Under the terms of its 1980–83 collective bargaining agreement with Union (the "CBA"), Badger was obligated to make contributions to Trust's pension fund (the "Fund"), calculated on the basis of all hours worked by Badger employees at tasks historically performed by pattern makers. CBA ¶ 20.2 specified the hourly contribution rate and CBA ¶ 20.4 incorporated the terms of the Agreement and Declaration of Trust (the "Declaration") creating Trust.

Declaration Art. VI, § 1 sets out the basis for contributions to the Fund:

> In order to effectuate the purposes hereof, each Employer shall contribute to the Fund the amount required by any written agreement as defined herein between the Union or the Trust and the Employer. The rate of contribution shall at all times be governed by the applicable written Agreement then in force and effect, together with any amendments, supplements or modifications thereto provided, however, that in the case of an Employer who is required to make contributions by reason of his being party to a written agreement other than a Collective Bargaining Agreement the amount of contribution shall be identical to the amount required by the Collective Bargaining Agreement in effect between the Employer Association and the Local Union having jurisdiction over the geographic area in which the covered Employees perform work. If no Employer Association exists within the geographical area then the rate of contribution shall be at the highest negotiated rate between the Union and the Employer existing in the geographical area within the jurisdiction of the Local Union, unless otherwise determined by the Trustees.

Declaration Art. I, § 1 defines "Employer" in part as one who:

> (c) in writing adopts and agrees to be bound by the terms and provisions of this [Declaration] as the same may be amended or modified from time to time; or
> (d) is a party to any written instrument which evidences an agreement to be bound by the provisions of this [Declaration].

Under Declaration Art. I, § 2(e) the term "Employee" encompasses, in addition to persons covered by a collective bargaining agreement obliging the Employer to make contributions to the Fund:

> any person who is not covered by a collective bargaining agreement but on whose behalf his Employer is otherwise obligated to make contributions to the Fund in accordance with the provisions of this [Declaration] who performs work which would be work performed by members of a bargaining unit recognized by the Employer or certified by the National Labor Relations Board if said persons' Employer were a party to any of the standard collective bargaining agreements by and between the Union and the [Pattern Manufacturers' Association of Chicago and Vicinity].

Finally Declaration Art. I, § 11 defines the term "written agreement" as:

> any agreement in writing which specifies the detailed basis on which contributions shall be made to the Fund together with any modifications, amendments or renewals thereof, including but not limited to collective bargaining agreements, memoranda of understanding which incorporate by reference collective bargaining agreements or this [Declaration], report forms in accordance with which contributions are made and which obligate the Employer to the provisions of this [Declaration], or any other agreement obligating the Employer signatory thereto to participate in or be bound by this [Declaration] and/or the Plan established pursuant hereto.

In each of 1971 and 1974, at the same time Badger entered into new collective bargaining agreements with Union, it also entered into a Contributory Employers' Agreement ("CEA") with Trust. In each CEA Badger "agrees to be bound by and to comply with all of the terms and provisions of the [Declaration]." In addition each CEA provides:

Contributions to the Trust by the undersigned, as required by the [Declaration], as amended, at the rates and in accordance with the Collective Bargaining Agreement applicable to the undersigned, as amended, modified, renewed or superseded, from time to time, shall commence as of the date required by said applicable Collective Bargaining Agreement and shall continue for the period therein provided and thereafter until written notice revoking this Agreement is given to the Trust.

With that contractual regime in place, Badger and Union entered into negotiations for an agreement to succeed the CBA, which was due to expire April 30, 1983. At the first bargaining session held February 16, 1983, Badger presented a proposed contract seeking wage and benefit concessions designed to assure Badger's effective competition in a difficult market (Def.Ex. 2, AA, BB). Similarly focused negotiations between Union and Badger continued into June despite the April 30 expiration of the CBA. Throughout those negotiations Badger proposed contributions to the Fund calculated at an hourly rate of $1.25—the contribution rate Badger had been obligated to pay under the CBA since May 1, 1982—for the duration of the agreement under negotiation.

Following a final bargaining session June 22, Badger President and sole shareholder Richard Blankenheim ("Blankenheim") sent a June 27 telegram to Union Business Manager Joe Grow ("Grow") (Def.Ex. F):

Based upon the status of our negotiations and the rejection of our final offer by the membership on June 11, 1983 Badger Pattern is constrained to implement the first year of its final offer.... Badger is constrained to take this action to protect its business interests and to improve its competitive posture within the industry. Implementation will become effective on June 28, 1983.

Next day (June 28) Union struck Badger. On June 29 Union filed charges with the NLRB, alleging Badger had implemented its final offer without having reached an impasse with Union. On August 16 the NLRB's regional director concluded impasse had been reached before June 27 and declined to pursue Union's charges. Union remains on strike against Badger.

In the weeks after the strike began, Badger hired permanent strike replacements. In addition a number of strikers crossed the picket line and returned to work. Badger made no contributions to the Fund based on the work done by the replacement workers, but it did continue to make contributions at the $1.25 rate reflecting work done by the returning strikers. Moreover Badger made some but not all contributions due on the work of pattern salesmen, on whose behalf it had historically made Fund contributions.

Contributions ceased altogether December 7, 1983 when Blankenheim wrote Grow that Badger proposed to withdraw, effective immediately, from participation in the Fund. That withdrawal was prompted by Blankenheim's attendance at a November 30 meeting of Trust's board of trustees (in his capacity as an employer trustee). Blankenheim had learned at the meeting that Badger might be accruing (1) withdrawal liability on account of the reduction in its contributions following June 28 and (2) liability for work done after June 28 not only by the returning strikers but by all Badger employees.

Blankenheim's December 7 letter also expressed a willingness to negotiate the proposed action in the course of efforts to resolve the split between Badger and Union, provided Union acted on or before December 15 to schedule a meeting. Union did not respond. On January 3, 1984 Badger's attorney wrote to Union referring to the December 7 letter and offering again to schedule a meeting. Such a meeting was held on January 9 but yielded no agreement. On January 17 Blankenheim wrote to Trust board chairman Eric Bergstrom (Pl.Ex. 13):

Effective December 7, 1983 Badger Pattern Works, Inc. has terminated its' [sic]

participating in the Pattern Makers' Pension Fund.

The fund office is receiving a copy of this letter along with our contributions thru December 7, 1983.

Also, effective December 7, 1983 I have resigned as a trustee of the Pension Fund.

In the meantime Trust had initiated this lawsuit January 11, alleging jurisdiction under NLRA § 301 and ERISA § 502 and seeking (1) recovery of unpaid Fund contributions dating back to June 28, the date the strike began, and (2) equitable relief compelling Badger to make future contributions.

As the parties have framed the issues on the present motions, basically three questions are before this Court:

    1. whether this Court has subject matter jurisdiction under either NLRA § 301 or ERISA § 502;

    2. whether Badger is liable to Trust for contributions on all work performed between June 28, 1983 and January 20, 1984 by (a) strike replacements, (b) returning strikers and (c) salesmen; and

    3. whether Badger remains obligated to make contributions to the Fund because it failed to bargain in good faith before terminating its participation in Trust.

Trust would answer each of those questions in the affirmative. It seeks judgment as a matter of law only as to the first two, noting that the good faith issue raised by the third is not amenable to resolution on a Rule 56 motion. Badger, on the other hand, would answer each question in the negative and seeks judgment as a matter of law on all three. This opinion will deal with each question in turn.

### Subject Matter Jurisdiction

NLRA § 301(a) provides:

Suits for violation of contracts between an employer and a labor organization representing employees in an industry affecting commerce as defined in this chapter, or between any such labor organization, may be brought in any district court of the United States having jurisdiction of the parties, without respect to the amount in controversy or without regard to the citizenship of the parties.

ERISA § 502(e)(1), also a jurisdictional statute, provides:

Except for actions under subsection (a)(1)(B) of this section the district courts of the United States shall have exclusive jurisdiction of civil actions under this subchapter brought by the Secretary or by a participant, beneficiary, or fiduciary. State courts of competent jurisdiction and district courts of the United States shall have concurrent jurisdiction of actions under subsection (a)(1)(B) of this section.

Whether either of those statutes vests this Court with jurisdiction over the present lawsuit turns in the first instance on the source of Badger's asserted obligation to make contributions to the Fund. Trust contends that obligation arises both from (1) the CBA, whose terms continued in force following the April 30 expiration by virtue of the "status quo" requirement read into NLRA § 8(a)(5) by *NLRB v. Katz*, 369 U.S. 736, 743, 82 S.Ct. 1107, 1111, 8 L.Ed.2d 230 (1962), and (2) the CEA, which obligated Badger to make contributions until January 20, 1984 (when Trust received notice of Badger's withdrawal). This opinion will consider the jurisdictional question in both contexts.

### 1. Obligation Arising from the CBA

    NLRA § 8(a)(5) provides:

It shall be an unfair labor practice for an employer—

   \*    \*    \*    \*    \*    \*

    (5) to refuse to bargain collectively with the representatives of his employees. . . .

*Katz*, 369 U.S. at 743, 82 S.Ct. at 1111 held the NLRA § 8(a)(5) obligation to bargain collectively was violated by "an employer's unilateral change in conditions of employment under negotiation." Accordingly the employer has an obligation to maintain the status quo, even after expiration of the

existing collective bargaining agreement, until negotiations have concluded either in a new agreement or impasse.

In the circumstances of this case, then, NLRA § 8(a)(5) and *Katz* imposed on Badger the continuing duty to make Fund contributions despite the April 30 expiration of the CBA, at least until impasse had been reached. Because any default in that obligation could be attacked by Union via an unfair labor practice charge, Badger invokes the principle of *San Diego Building Trades Council v. Garmon,* 359 U.S. 236, 245, 79 S.Ct. 773, 780, 3 L.Ed.2d 775 (1959) to say suit will not lie here:

> When an activity is arguably subject to § 7 or § 8 of the [NLRA], the States as well as the federal courts must defer to the exclusive competence of the National Labor Relations Board....

Trust retorts by urging:

> 1. Where an unfair labor practice is also a breach of a collective bargaining agreement, NLRA § 301 specifically authorizes enforcement action in a federal district court, thus rendering inapplicable *Garmon*'s "exclusive competence" concept.
>
> 2. Trust (as contrasted with Union) would have no standing to bring charges before the NLRB, so Trust's NLRA § 301(a) suit is necessarily the only available remedy.

■ This Court need not resolve the parties' competing contentions. What is dispositive instead is that Trust's claim is not really one "for violation of contract." Because the period in dispute is *post*-contract, the obligation is one implied in law rather than one created by the contract itself. In short this Court lacks jurisdiction under NLRA § 301 to hear a claim arising from the status quo requirement embodied in NLRA § 8(a)(5). *Cement Masons Health and Welfare Trust Fund v. Kirkwood-Bly, Inc.,* 520 F.Supp. 942, 943–45 (N.D.Cal.1981), *aff'd,* 692 F.2d 641 (9th Cir. 1982).

■ Whether the obligation to make pension fund contributions arising from the NLRA § 8(a)(5) status quo requirement falls within this Court's jurisdiction under ERISA § 502 poses a somewhat more complicated question. Its resolution turns on the construction of ERISA § 515, which renders an employer liable for delinquent contributions:

> Every employer who is obligated to make contributions to a multiemployer plan under the terms of the plan or under the terms of a collectively bargained agreement shall, to the extent not inconsistent with law, make such contributions in accordance with the terms and conditions of such plan or agreement.[2]

Continued negotiations after a labor contract has expired are a frequently-encountered occurrence. And of course ERISA litigation is a high-volume industry. It might be expected, then, that the question posed here would be often-litigated (and hence likely well-settled). Not so—all the litigants and this Court's own research have uncovered are two district court opinions on point, and those have come to opposite conclusions. Compare *Laborers Health & Welfare Trust Fund v. Hess,* 594 F.Supp. 273, 278–82 (N.D.Cal.1984) (holding jurisdiction exists) with *Mo-Kan Teamsters Pension Fund v. Botsford Ready Mix Co.,* 605 F.Supp. 1441, 1444–48 (W.D.Mo.1985) (holding jurisdiction does not exist).

There is no need to rehearse in this opinion the intricate arguments from statutory language and legislative history spun out in *Hess* and *Botsford.* Suffice it to say that in this Court's view Senior Judge Hunter's analysis in *Botsford* offers a better-grounded application of the statute in circumstances analogous to those presented here. It would do violence to the statutory phrase "contributions ... under the terms of the plan or ... agreement" to embrace contributions forced by an implied legal obligation after the agreement has

**2.** ERISA § 515 states the substantive rule Trust claims Badger violated, so as to give rise to jurisdiction under ERISA § 502.

expired. And the analogy to ERISA, 29 U.S.C. § 1392(a) suggested in *Hess,* 594 F.Supp. at 279 really cuts the other way by negative inference. Under the reasoning of *Botsford*—which requires no substantive elaboration, particularly when considered in the context of *Hess*—this Court lacks jurisdiction under ERISA §§ 502 and 515 to hear a claim for pension fund contribution arising from the NLRA § 8(a)(5) status quo requirement.

### 2. *Obligation Arising from the CEA*

NLRA § 301(a) has been broadly interpreted by the Supreme Court to confer jurisdiction though the actual lawsuit does not involve an employer and an organization representing employees (*Smith v. Evening News Association,* 371 U.S. 195, 200, 83 S.Ct. 267, 270, 9 L.Ed.2d 246 (1962)) or focuses on a contract other than a collective bargaining agreement—a strike settlement agreement, for example (*Retail Clerks v. Lion Dry Goods, Inc.,* 369 U.S. 17, 28, 82 S.Ct. 541, 548, 7 L.Ed.2d 503 (1962)). By its terms, however, NLRA § 301 does require the *contract* in suit to be one between an employer and a labor organization representing employees. That statutory requirement has led courts to the conclusion that "standing alone, a welfare and pension plan could hardly qualify as a 'labor contract' for purposes of [NLRA § 301]." *Caporale v. Di-Com Corp.,* 345 F.Supp. 153, 154–55 (N.D.Ill. 1972), quoting *O'Rourke v. Breakstone Brothers, Inc.,* 218 F.Supp. 648, 651 (S.D. N.Y.1963). On the other hand, a pension trust agreement can form the basis for jurisdiction under NLRA § 301(a) when it is part and parcel of an effective collective bargaining agreement. See *Alvares v. Erickson,* 514 F.2d 156, 161 (9th Cir.1975); *Rehmar v. Smith,* 555 F.2d 1362, 1367 (9th Cir.1976).

■ That authority compels the conclusion this Court lacks jurisdiction under NLRA § 301(a) to decide the merits of a dispute arising from the CEA. As an agreement solely between Trust and Badger, the CEA does not qualify as a "contract between an employer and a labor organization" under NLRA § 301(a). And because Trust sues for contributions arising after the April 30 expiration of the CBA, there is no basis for concluding the CEA gives rise to jurisdiction by virtue of being part and parcel of an NLRA § 301 contract.

■ But implicit in the preceding analysis characterizing the CEA as an agreement between Trust and Badger is the conclusion this Court *does* have jurisdiction under ERISA § 502 over the merits of a dispute arising from the CEA. ERISA § 515 renders an employer liable for delinquent contributions it is required to make under the terms of a multiemployer plan or under the terms of a collective bargaining agreement. Once the CBA had expired, Badger had no ERISA § 515 liability under the CEA by virtue of its having been incorporated into the CBA. But by means of the CEA, Badger independently agreed with Trust "to be bound by and to comply with all of the terms and provisions of the [Declaration]." Thus to the extent Badger's alleged violation of ERISA § 515 arises from the breach of obligations Badger assumed running to Trust under the CEA, this Court has jurisdiction under ERISA § 502 to hear the claim.

Badger does not contest that conclusion, but rather argues it had no obligation to contribute to the Fund arising from the CEA and the incorporated terms of the Declaration:

    1. It says the CEA was not intended to create contribution liability independent of the CBA, but only to guard the interests of any Badger employees who were not represented by a collective bargaining unit yet on whose behalf Badger made Fund contributions.

    2. It also says the CEA is not a validly executed and enforceable contract.

Both arguments earn high marks for imagination but not for credibility.

■ Badger's first contention is founded on NLRA § 302(c)(5)(B), which prohibits an employer from making contributions on behalf of employees to a pension trust fund unless (among other requirements):

> the detailed basis on which such payments are to be made is specified in a written agreement with the employer. . . .

Badger argues the NLRA § 302(c)(5)(B) requirement is typically satisfied so far as bargained-for employees are concerned by the collective bargaining agreement, while the CEA was designed solely to assure the existence of a detailed written agreement to cover pension contributions made on behalf of any nonbargained-for employees (i.e., employees not subject to a collective bargaining agreement) Badger might have.[3] Badger asserts the CEA should not be read as intended to impose dual liability as to employees covered by the CBA. Indeed Badger Mem. 27–28 maintains:

> [W]hen dealing with an employer with bargained-for employees, § 302(c)(5)(B) requires that the written agreement consist of a collective bargaining agreement. An employer whose employees are represented has an obligation under § 8(a)(5) of the NLRA to bargain with the employee representative over pension fund contributions. ERISA explicitly provides that it does not alter, amend, modify, invalidate, impair, or supersede any law of the United States. 29 U.S.C. § 1144(d). As a result, a collective bargaining agreement is required in this situation.

That analysis, both as to the intended purpose of the CEA and as to the necessity of a collective bargaining agreement to satisfy NLRA § 302(c)(5)(B) where bargained-

for employees are concerned, is novel. In the end, however, it is wholly unpersuasive.

First, as Badger acknowledges, there is no real support in the case law for the proposition that a collective bargaining agreement alone will suffice to satisfy NLRA § 302(c)(5)(B) as to bargained-for employees. Nor does the NLRA § 8(a)(5) collective bargaining requirement foreclose contribution liability arising from an agreement other than a collective bargaining agreement in circumstances where the contribution obligation arose in the first instance from a collective bargaining agreement.[4] Indeed this case illustrates graphically the desirability of such a supplemental agreement. After the expiration of the CBA Badger remained obligated to continue making Fund contributions under the NLRA § 8(a)(5) status quo requirement, a neglect of which Union could make the subject of an unfair labor practice charge before the NLRB. But as the jurisdictional discussion in this opinion suggests, Trust would have no direct action against Badger in the event contributions were suspended during the collective bargaining period—a circumstance that could seriously impair its ability to fulfill its duties as a fiduciary. Thus the CEA plays an important role: It provides Trust with a direct action against Badger in that eventuality (and no doubt others), imposing on Badger the insignificant burden of providing written notice of any revocation of its contribution obligation. Hence the CEA serves a purpose independent of the CBA, without infringing the collective bargaining obligation embodied in NLRA § 8(a)(5).

■ As for Badger's claim the CEA was intended to cover only non-bargained-for employees, little need be said. That argu-

---

**3.** Badger claims the CEA was intended to prevent the problem that arose in *Moglia v. Geoghegan,* 403 F.2d 110, 114–19 (2d Cir.1968), which found contributions made on behalf of non-represented employees to be invalid for lack of an NLRA § 302(c)(5)(B) written agreement.

**4.** It bears emphasizing the starting date for Badger's obligation to make contributions under the CEA was coterminous with its obligation under the CBA. That fact confirms the supplemental character of the CEA. It plainly was not the primary source of Badger's obligation to make Fund contributions on behalf of Union employees.

ment, spun out fancifully from cases like *Moglia* (see n. 3), is not supported by the language of the CEA, and Badger has made no effort to support its proposition by producing extrinsic evidence (even were it admissible under the parol evidence rule) of the parties' intent.[5] Under the circumstances this Court must look to the CEA itself, which in literal and unequivocal language covers Badger's entire contribution obligation, not simply that portion allocable to non-bargained-for employees.

■■■■ Badger's second argument—that the CEA is not a validly executed contract—focuses on the technicality that neither the 1971 nor the 1974 CEA was executed by Trust. But in fact the 1971 CEA was countersigned on behalf of Trust (Pl.Ex. 46). Even on the questionable assumption the lack of a countersignature on the 1974 CEA rendered it unenforceable, the 1971 document by its terms remained in effect until Trust received written notice of its revocation. Badger also asserts the CEA was without consideration on Trust's part because Trust promised to do no more than it was already obligated to do under the Declaration and the various collective bargaining agreements incorporating the Declaration. But of course by means of the CEA, Trust promised to accept contributions on behalf of *all* Badger employees, even in the absence of a collective bargaining agreement. Thus the CEA broadened the scope of Trust's obligation, and that broadening suffices as consideration for Badger's promise.

In sum, the CEA (whether the 1971 or the 1974 version) is indeed an enforceable contract. This Court has jurisdiction under ERISA § 502 to consider whether Badger is in breach of that contract and therefore of ERISA § 515.

*Badger's Contribution Liability: June 28, 1983 to January 20, 1984*

In light of this Court's jurisdictional findings, its decision on the merits must turn on an analysis of Badger's obligations under the terms of the CEA and the Declaration. Four aspects of Badger's alleged contribution liability are in issue:

1. liability as to returning strikers;
2. liability as to strike replacements;
3. liability as to salesmen; and
4. the date on which Badger's contribution liability terminated.

■■■■ As to the returning strikers, the only matter in dispute is Badger's liability for the period between December 7, 1983 and January 20, 1984. Both Badger and Trust acknowledge contributions were made on behalf of returning strikers from the day they returned until December 7. Badger, however, contends its liability ended when Blankenheim wrote to Grow proposing to terminate Badger's participation in Trust and introducing the possibility of establishing a private pension program for Badger employees.

That proposition is not supportable. In the first place the returning strikers remained "employees" within the terms of the Declaration under Art. I, § 2(e) (quoted early in the text of this opinion). Even if they were no longer covered by an effective collective bargaining agreement, they were at least performing pattern makers' work—the test specified in Declaration Art. I, § 2(e). As for the asserted December 7 termination date, the CEA by its express terms provides it shall remain in effect pending written notice to Trust of Badger's revocation. Badger did not mail such a notice until January 17, 1984, and Trust did not receive the notice until January 20. Consequently the CEA was not effectively revoked until January 20, leaving Badger liable until that date for contributions on work performed by returning strikers.

---

**5.** Badger ascribes as evidence to support its claim the fact that Trust submitted CEAs to Badger in 1971 and again in 1974, but has not done so since then. Badger attributes that to Trust's having recognized that such supplemental agreements had no purpose with respect to Badger, an employer with no non-bargained-for employees. But the more plausible inference (and the one favoring the nonmovant, see n. 1) is that Trust submitted no more CEAs for execution because there was no need to re-execute an agreement that by its terms did not terminate until Badger provided Trust with notice of revocation.

■ Precisely the same analysis applies to the strike replacements. As workers employed to replace striking pattern makers, they were by definition doing work within the terms of Declaration Art. I, § 2(e). They were therefore "employees" within the terms of the Declaration. It follows that so long as Badger was obligated to make Fund contributions according to the terms of the Declaration, it was required to make contributions on behalf of strike replacements. Because the CEA was not effectively revoked until January 20, thereby terminating Badger's participation in Trust (see Declaration Art. XI, Section 1), Badger is obligated to make contributions on work performed by strike replacements from the date those replacements were hired to January 20.

■ Salesmen stand in a more problematic status. Trust represents that Badger persuaded several Union pattern makers to become Badger salesmen, but then continued to make Fund contributions on their behalf. In 1980 Trust discussed the status of those employees with Badger, and it was decided the salesmen would be deemed part of the collective bargaining unit for pension plan purposes. Badger continued to make Fund contributions based upon their work up to the strike in 1983, but it has made no such contributions since.

Badger has not contested that account of events, but Trust has offered no evidence competent in Rule 56(e) terms to support its story.[6] As a result this Court is not in a position to decide the merits of Trust's claim as to the salesmen on the present motion. Nevertheless if Trust's summary of events is true, it would appear the salesmen are likely to be employees under Dec-

laration Art. I, § 2(c), which includes in the "employee" definition:

> any person on whose behalf an Employer has made contributions to the Fund and has reported same on a standard report form which contains a provision binding said Employer to the provisions of this [Declaration] or otherwise evidencing said Employer's intent to be so bound....

But again Trust has provided this Court with no evidence adequate to support a judgment as to the salesmen. To that extent, accordingly, Trust's motion must be denied.[7]

One final matter not explicitly addressed by the parties requires mention: the rate at which Badger was obligated to make contributions between June 28, 1983 and January 20, 1984. Under the CEA Badger was to make contributions to the Fund "at the rates and in accordance with the Collective Bargaining Agreement applicable to the undersigned." As of April 30, 1983 the CBA had expired, leaving unspecified the applicable contribution rate and terminating Badger's obligation under the CBA to make Fund contributions. But Declaration Art. VI, § 1 fills any gap by specifying an Employer required to make contributions under a written agreement other than a collective bargaining agreement shall make such contributions at the rate "required by the Collective Bargaining Agreement in effect between the Employer Association and the Local Union having jurisdiction over the geographic area in which the covered Employees perform work." That rate would appear to be $1.25 per hour for the entire relevant period, though a final determination on that score must await further proof.

---

6. Neither party has seen fit to comply with this District Court's General Rule 12(e) and 12(f), designed to avoid just such gaps in summary judgment motions by distinguishing between factual areas in dispute and those that are uncontested. Badger's memorandum challenges the coverage of strike replacements but not salesmen (except of course for the broadside attacks on liability as a whole), so it seems likely Trust's factual characterization is undis-

puted. Judgments, however, cannot rest on mere likelihood.

7. Such denial is necessarily without prejudice to Trust's providing admissible evidence and renewing its motion. Indeed if the facts are not in dispute the parties might serve litigants' and judicial economy by tendering a stipulation on the subject.

### Badger's Continuing Liability

■ Trust finally urges Badger's contribution liability continues to accrue to date, despite the January 20, 1984 notice revoking the CEA, because Badger failed to negotiate in good faith the termination of its participation in Trust. But as Badger asserts:

> The circumstances surrounding the termination or the employer's reasons are not of concern to the trust. Instead the union representing those employees is the interested party to questions concerning an employer's good or bad faith bargaining.

That statement is beyond challenge, particularly in light of this Court's lack of jurisdiction under either NLRA § 301(a) or ERISA § 502 to consider claims involving Badger's alleged failure to meet its obligations under NLRA § 8(a)(5). Trust points to no language either in the CEA or the Declaration empowering it to challenge Badger's negotiations with Union. Accordingly Badger's motion for summary judgment must be granted as to Trust's claim of continuing contribution liability.

### Conclusion

This Court has jurisdiction under ERISA § 502 to determine Badger's liability for Fund contributions under the CEA and the Declaration. There is no genuine issue of material fact, and Trust is entitled to a judgment as a matter of law, as to Badger's liability for contributions on behalf of returning strikers and strike replacements for the period June 28, 1983 to January 20, 1984. On the present showing this Court is unable to determine definitively whether Badger is also liable (as appears likely) for contributions on behalf of salesmen during that period. Badger's Rule 56 motion as to all those issues is of course denied. Finally there is no genuine issue of material fact, and Badger is entitled to a judgment as a matter of law, as to its non-liability to Trust for any contributions calculated on work done after January 20, 1984.

