**PAINTERS TRUST, WESTERN WASHINGTON, Painters Pension Trust, Western Washington, Apprenticeship and Training Trust, Plaintiffs,**

v.

**SANDVIG–OSTERGARD, INC., a Washington corporation; Wayne C. Sandvig and Jane Doe Sandvig, his wife, Defendants.**

No. C88–1125M.

United States District Court,
W.D. Washington,
at Seattle.

Jan. 30, 1990.

John Ranquet, Seattle, Wash., for plaintiffs.

Herman L. Wacker, Riddell, Williams, Bullitt & Walkinshaw, Seattle, Wash., for defendants.

ORDER

McGOVERN, District Judge.

THIS MATTER comes on for consideration by the undersigned Judge of the

above-entitled court upon motions, that of the defendants denominated a motion for summary judgment dismissing the plaintiffs' claims for delinquent trust fund contributions "on the grounds that this court lacks jurisdiction over the subject matter of the dispute", and that of the plaintiffs, denominated a cross motion for summary judgment "for contributions". The defendant employer also seeks Rule 11 sanctions against the plaintiff trusts and their attorney "for filing a baseless claim."

Facts material both to the jurisdictional and delinquency issues are not in genuine dispute.

Defendant employer Sandvig–Ostergard is a small construction company engaged in the business of supplying and installing wall coverings for contractors, decorators and building owners in the Seattle–Tacoma area. Organized in 1979, the company shortly thereafter initiated a labor agreement with the Painters District Council No. 5.

A Registration and Counterpart Agreement was executed on May 15, 1979, and another was executed on January 19, 1981. The last written agreement between the company and the painters' union was the Western Washington Area Agreement for the Painting and Drywall Industry, effective July 1, 1983 to May 31, 1986. From the inception of the collective bargaining agreement, the company assigned its bargaining rights to the Painting and Decorating Contractors of America (PDCA). The PDCA is an industry group which engages in multi-employer collective bargaining with the painters union.

By letter dated January 6, 1986, the company gave the union notice of termination of the 1983–1986 collective bargaining agreement, effective May 31, 1986. That letter included the following declarations.

> You are also hereby notified that this employer no longer intends to engage in collective bargaining with your organization or any of its constituents through multi-employer bargaining. We are withdrawing from the multi-employer bargaining unit, however, we are not withdrawing recognition of your organization as the collective bargaining representative of our employees. We will recognize and bargain for a new agreement in a bargaining unit limited to the operations of this employer i.e. bargaining on a single-employer basis.

> By this letter this company reaffirms that the Western Washington PDCA Labor Relations Board is our exclusive representative for collective bargaining, however, the bargaining will henceforth be a single-employer unit bargaining. Our negotiator is free to negotiate with you separately for our company, or for convenience purposes, simultaneously with other employers it represents.

The union by letter dated February 13, 1986, acknowledged receipt of the company's letter dated January 6, 1986, terminating the 1983–1986 Western Washington Area Agreement for Painting and Drywall Industry, effective May 31, 1986, and declared,

> We will negotiate with the P.D.C.A. for your firm.

On June 25, 1986, the Painters' District Council No. 5 struck the painting industry.

> At Sandvig–Ostergard all of the employees covered by the union contract, except my brother, Warren Sandvig, withheld services on the first day of the strike. A short time later, one of the union employees, Jim Poston, returned to work. None of the other union employees has returned to work. In order to continue the operations of Sandvig–Ostergard, the company hired temporary strike replacements to fill the positions vacated by the striking employees.

Affidavit of Wayne C. Sandvig in Support of Defendants' Motion for Summary Judgment and Sanctions, dated January 24, 1989, at page 3.

By letter dated July 16, 1986, the company withdrew its bargaining rights from the Washington State Council PDCA and declared its wish to negotiate with the union individually and separately. Responding by letter dated July 17, 1986, the executive secretary of the union acknowledged receipt of the company's July 16 notice of withdrawal of bargaining rights from the

PDCA, and offered what the company president describes as "dates for bargaining sessions." Sandvig Affidavit at 4.

Efforts by representatives of the union and the company through December, 1986, to meet for purposes of negotiating a renewed labor agreement were unsuccessful. Some inaction on both sides in this respect appears in the record. *Id.*, at 4, 5; and Exhibits G and H.

Crucial to the resolution of the matters before the Court for consideration is the defendant employer's conduct following the expiration of the 1983–1986 collective bargaining agreement on May 31, 1986. In that respect, the affidavit of defendant Wayne Sandberg reads, in part, at pages 4 through 6, as follows:

Sandvig–Ostergard paid the union employees who continued to work during the strike the existing wages and benefits they had been receiving under the expired contract. The company regularly and timely paid contributions for Warren Sandvig and Jim Poston to the plaintiff trust funds on the same basis as was required under the terminated 1983–1986 collective bargaining agreement. The strike replacements were paid according to individual arrangements between the strike replacement and the company. When the strike replacements were hired, I assumed their employment would be for a very short term. Initially, the strike replacements were not provided with medical benefits. This status continued through December, 1986.

. . . . .

By January, 1987, the lack of any interest by the union in bargaining with Sandvig–Ostergard as reflected by its failure to attend two bargaining meetings and its failure to make any attempt to reschedule negotiations, led me to conclude that the dispute would not reach resolution with a renewed collective bargaining agreement in the near future. It was necessary to develop a set of fringe benefit programs for uniform application to all Sandvig–Ostergard employees, especially to provide health insurance benefits to the temporary strike replacement employees. Effective January, 1987, Sandvig–Ostergard implemented a King County Medical Health Insurance program for all the employees and ceased making benefit payments on behalf of Poston and Sandvig. Poston and Sandvig were provided the same benefits as the strike replacement employees.

That the company reported and paid contributions on behalf of its union employees for the months of June, 1986, through March, 1987, is not denied. *See, id.*, Exhibits I(a) through (g); Bruens Affidavit, Exhibits I(h) through (j).

That contributions on behalf of strike replacements were not reported or paid under the 1983–1986 labor and trust agreements is not denied. An audit, authorized under the agreements, disclosed contributions due and owing on strike replacements for the period March through December, 1986, in the amount of $10,155.15. *See*, Elia Certificate signed February 24, 1989, and attachments.

From June, 1986 through March, 1987, the trust paid health and welfare claims on behalf of Wayne Sandvig, Warren Sandvig, Jim Poston, Donald Kelly, William Tews, and M. Mailtaud. Bruens Certificate at 8.

In January, 1987, the union filed unfair labor practice charges against various employer members of the PDCA, including Sandvig–Ostergard. The union claimed that the employers violated Section 8(d)(4) of the National Labor Relations Act by deviating substantially from the terms of the preexisting contract. After an investigation, the NLRB refused to issue a complaint against defendant Sandvig–Ostergard.

A letter dated April 9, 1987, from the defendant employer to the union reads in part as follows:

I have reviewed the recent PDCA agreement with District Council No. 5.

I have determined not to enter into a new agreement at this time and therefore decline to bargain for a new contract.

I may have a need for specific job agreements in the future and would appreciate

the opportunity to discuss this with you as the need arises.

We will no longer be bound by the terms of the expired agreement and will discontinue fringe reports or payments to the trusts.

Please call me if you have any questions.

On August 11, 1988, the plaintiff trusts filed this lawsuit alleging delinquent contributions, including but not limited to those disclosed by the audit as due and owing from March through December, 1986. The trusts allege that the federal court has jurisdiction under Section 502 of ERISA, 29 U.S.C. § 1132, and Section 301 of the Labor Management Relations Act ("LMRA"), 29 U.S.C. § 185.

## DISCUSSION

█ The defendant employer's jurisdictional argument is narrowly drawn.

This lawsuit arises out of events that occurred after a collective bargaining agreement had expired. The sole issue in this case concerns an employer's duties after the expiration of an agreement. Defendant Sandvig–Ostergard, Inc. ("Sandvig–Ostergard") asks the court to grant its Motion for Summary Judgment on the grounds that this court lacks jurisdiction over the subject matter of the dispute.

More specifically, courts have no jurisdiction to determine an employer's post-contractual duties. Such a determination requires interpretation of the National Labor Relations Act ("NLRA"). Since the National Labor Relations Board has exclusive jurisdiction over violations of the NLRA, this court should dismiss plaintiffs claim. Sandvig–Ostergard also requests sanctions against plaintiff and/or its counsel for filing this lawsuit. Despite having knowledge of the relevant facts and controlling law, plaintiffs have pursued a baseless claim. Defendant's Memorandum in Support of Its Motion for Summary Judgment and Sanctions at pp. 1–2.

The employer's supporting memorandum repeats again and again a single proposition: Neither ERISA nor the LMRA concern an employer's post-contractual duties; ERISA and the LMRA only apply if a valid contract exists; the only authority for determining the post-contractual duty of an employer exists under the NLRA; unfair labor practices are litigated only before the NLRB; the undisputed facts demonstrate that Sandvig–Ostergard's actions, if unlawful at all, could only have violated the NLRA; no other law or statutory scheme could possibly apply to these facts; the legality of Sandvig–Ostergard's conduct is indisputably a subject for resolution under the NLRA; if Sandvig–Ostergard had any duty to make contributions after the expiration of the contract, the duty comes from the NLRA and not ERISA; this court is without jurisdiction because the Painters Trust must rely exclusively on the NLRA for its claim that Sandvig–Ostergard must continue contributions after the expiration of the collective bargaining agreement; the NLRB is the only forum for deciding whether Sandvig–Ostergard committed an unfair labor practice; because no effective contract existed at the time of the alleged delinquent contributions, the Painters Trust has no remedy under ERISA or the LMRA and the courts have no jurisdiction. *Id.,* at pp. 6, 7, 9, 10, 11.

As authority for its position, the defendant employer relies exclusively on *Laborers Health and Welfare Trust Fund for Northern California, et al. v. Advanced Lightweight Concrete Co., Inc.,* 484 U.S. 539, 108 S.Ct. 830, 98 L.Ed.2d 936 (1988) ("Advanced Concrete") in which the Supreme Court affirmed a decision of the Ninth Circuit, holding that the remedy provided in §§ 515 and 502(g)(2) of ERISA is limited to contractual, "promised contributions", and does not confer jurisdiction on district courts to determine whether an employer's unilateral decision to refuse to make postcontract contributions violates the NLRA. Sandvig–Ostergard characterizes *Advanced Concrete* as "virtually identical" with the case at bar, and controlling here.

In *Advanced Concrete,* the employer was a party to two multi-employer collective bargaining agreements. The agree-

ments, which required monthly contributions to eight employee benefit plans, were executed in 1980 and were to expire on June 15, 1983.

On April 1, 1983, respondent notified both unions that it had terminated the association's authority to bargain on its behalf, that it would not be bound by either master agreement (or any successor agreement) after the June 15, 1983, expiration date, and that it was prepared to negotiate with the unions independently. Respondent continued to contribute to the eight trust funds until June 15, 1983, but has made no contributions since that date.

*Advanced Concrete* at 542, 108 S.Ct. at 832.

Petitioner trustees of the eight plans sued in the Federal District Court for the Northern District of California to collect contributions for the period after June 15, 1983, alleging that the employer's unilateral decision to change the terms and conditions of employment by discontinuing its contributions constituted a breach of its duty to bargain in good faith and violated § 8(a)(5) of the NLRA, 29 U.S.C. § 158(a)(5). The complaints alleged that the federal court had jurisdiction under §§ 502(g)(2) and 515 of ERISA.

Respondent's answer to the complaint challenged the District Court's jurisdiction and also denied that respondent had any statutory duty to make contributions to the funds because its negotiations with the unions had reached an "impasse". [footnote omitted.] The "impasse" issue has never been resolved because the District Court granted a motion for summary judgment based on two other grounds: That § 515 of ERISA does not apply to an employer's obligations under § 8(a)(5) of the NLRA; and that the National Labor Relations Board (NLRB) has exclusive jurisdiction over petitioners' claims.

The Court of Appeals affirmed. 779 F.2d 497 (CA9 1985). It necessarily assumed that petitioner could prove that respondent's postcontract refusal to contribute to the funds was an unfair labor practice.[6] It held, however, that the claims should be resolved by the NLRB rather than by a federal district court. After examining the text and the legislative history of the Multiemployer Pension Plan Amendments Act of 1980 (MPPAA), the Court concluded:

"We find no persuasive evidence in either the plain words or legislative history of ERISA or the MPPAA that Congress intended section 515 to be an exception to the general rule of NLRB preemption for that narrow category of suits seeking recovery of unpaid contributions accrued during the period between contract expiration and impasse." *Id.*, at 505, 108 S.Ct. at 833–34.[7]

We granted certiorari, 479 U.S. 1083, 107 S.Ct. 1283, 94 L.Ed.2d 142 (1987), and now affirm.

---

[6] "Freezing the status quo ante after a collective agreement has expired promotes industrial peace by fostering a non-coercive atmosphere that is conducive to serious negotiations on a new contract. Thus, an employer's failure to honor the terms and conditions of an expired collective-bargaining agreement pending negotiations on a new agreement constitutes bad faith bargaining in breach of sections 8(a)(1), 8(a)(5) and 8(d) of the National Labor Relations Act ... *NLRB v. Katz*, 369 U.S. 736, 743 [82 S.Ct. 1107, 1111, 8 L.Ed.2d 250] ... (1962). Consequently, any unilateral change by an employer in the pension fund arrangements provided by an expired agreement is an unfair labor practice. *Peerless Roofing Co. v. NLRB*, 641 F.2d 734, 735 (9th Cir.1981); *Producer's Dairy Delivery Co. v. Western Council of Teamsters Pension Trust Fund*, 654 F.2d 625, 627 (9th Cir.1981)." 779 F.2d at 500.

[7] All other Courts of Appeals that have addressed this issue have reached the same result. See *New Bedford Fishermen's Welfare Fund v. Baltic Enterprises, Inc.*, 813 F.2d 503 (C.A.1 1987); *Moldovan v. Great Atlantic & Pacific Tea Co.*, 790 F.2d 894, 900–901 (C.A.3 1986); *U.A. 198 Health & Welfare, Education & Pension Funds v. Rester Refrigeration Service, Inc.*, 790 F.2d 423 (C.A.5 1986).

*Advanced Concrete* at 543–545, 108 S.Ct. at 832–34.

The petitioner trustees in *Advanced Concrete*, accordingly, sued to collect contributions for the period after June 15, 1983. They alleged that the respondent's unilateral decision to change the terms and conditions of employment by discontinuing

its contributions constituted a breach of its duty to bargain in good faith, in violation of § 8(a)(5) of the NLRA, allegations ordinarily within the exclusive competence of the National Labor Relations Board. The trustees alleged federal court jurisdiction under ERISA, §§ 502(g)(2) and 515, as an "independent federal remedy". *See,* 484 U.S. at 543, n. 4, 108 S.Ct. at 832, n. 4.

The district court, as noted above, granted a motion for summary judgment on two grounds:

That § 515 of ERISA does not apply to an employer's obligations under § 8(a)(5) of the NLRA; and that the National Labor Relations Board (NLRB) has exclusive jurisdiction over petitioner's claims.

The court of appeals affirmed. In doing so, "It necessarily assumed that petitioner could prove that respondent's postcontractual refusal to contribute to the funds was an unfair labor practice." 484 U.S. at 544, 108 S.Ct. at 833, footnote omitted.

In the case at bar, however, we are not asked to decide whether an employer's postcontract refusal to contribute to employee trust funds was an unfair labor practice. We are not presented with a denial that the employer had any statutory duty to make contributions because its negotiations with the union had reached an impasse.

More importantly, we are not presented with an employer who stopped reporting and making trust contributions on behalf of his union employees in compliance with the expired collective bargaining and trust agreements during the months of June, 1986, through March, 1987. The defendant employer's letter dated April 9, 1987 to the union, quoted at length above, concluded with the declaration,

We will no longer be bound by the terms of the expired agreement and will discontinue fringe reports and payments to the trusts.

We are presented with an employer who reported and made contributions on some but not all of his employees, as required under the agreements. Unlike the employer in *Advanced Concrete,* Sandvig–Oster-

gard elected to obtain the benefits of the trust plans from June, 1986 through March, 1987. Having done so, it was obliged under the Labor Management Relations Act and the Multiemployer Pension Plan Amendments Act to comply with the trust plans and agreements. Title 29, U.S.C. § 186(c)(5), 515 and 502(g)(2).

The defendant employer's jurisdictional challenge is without merit. *Advanced Concrete,* on which the employer's memorandum in support of its motion for summary judgment exclusively relies, is not dispositive. That determination is based on the lengthy summary of undisputed facts and the legal analysis set forth above. Added support is provided in caselaw advanced by the plaintiffs and addressed in the briefs.

In *Pattern Makers Trust Fund v. Badger Pattern Works, Inc.,* 615 F.Supp. 792 (N.D.Ill.1985), the trust fund sued to recover unpaid contributions, including contributions on behalf of strike replacements for the period between the expiration of the existing bargaining agreement and impasse. The Ninth Circuit, in *Laborers Health and Welfare Trust Fund for Northern California, et al. v. Advanced Lightweight Concrete Co., Inc.,* 779 F.2d 497 (9th Cir.1985), at 502 n. 9, pointed out that,

In *Badger,* the court found an alternative ground for jurisdiction under ERISA § 502. *Badger,* 615 F.Supp. at 800–02. The employer had signed, as a term of the expired collective agreement, a supplemental agreement with the trust fund committing itself to contribute to the funds "until written notice revoking this Agreement is given to the Trust." *Id.* at 796–97.

Badger's failure to revoke this supplemental agreement until many months after the collective agreement had expired made it liable to the trust fund for delinquent contributions between expiration and revocation. *Id.* at 801–02. There is no evidence in the record of any supplemental agreement between Advanced and the trust funds. The actual trust agreements are not part of this record,

but they must also be assumed not to provide the trust funds with any basis of recovery other than § 515.

The supplemental agreement in *Badger* was a Contributory Employers' Agreement (CEA) with the trust. The *Badger* Court said, at page 800:

> But implicit in the preceding analysis characterizing the CEA as an agreement between Trust and Badger is the conclusion that the Court *does* have jurisdiction under ERISA § 502 over the merits of a dispute arising from the CEA. ERISA § 515 renders an employer liable for delinquent contributions it is required to make under the terms of a multiemployer plan or under the terms of a collective bargaining agreement. Once the CBA has expired, Badger had no ERISA § 515 liability under the CEA by virtue of its having been incorporated into the CBA. But by means of the CEA, Badger independently agreed with Trust "to be bound by and to comply with all of the terms and provisions of the [Declaration]." Thus to the extent Badger's alleged violation of ERISA § 515 arises from the breach of obligations Badger assumed running to Trust under the CEA, this court has jurisdiction under ERISA § 502 to hear the claim.

■ Sandvig–Ostergard contends that in executing the Registration and Counterpart Agreements here, it did not independently agree to be bound by and to comply with all of the terms of the trust agreements because the counterpart agreements do not contain "the continuation language or independent expiration/termination provisions like the language in the *Badger* agreement."

In *Badger*, the employer argued that the CEA was not intended to create contribution liability independent of the CBA. The court characterized Badger's argument as follows at 801:

> That analysis, both as to the intended purpose of the CEA and as to the necessity of a collective bargaining agreement to satisfy NLRA § 302(c)(5)(B) where bargained-for employees are concerned,

is novel. In the end, however, it is wholly unpersuasive.

Similarly here, the counterpart agreements set forth the employer's entire contribution obligation. The argument that the agreements are compromised by the absence of termination language is unsupported and without merit.

The plaintiff trustees advance decisional authorities for the proposition that Sandvig–Ostergard by conduct adopted the 1983–1986 collective bargaining agreement after it expired. In *Construction Teamsters Health and Welfare Trust v. Con Form Construction Corp.*, 657 F.2d 1101 (9th Cir.1981), the issue on for review was whether a Short Form Agreement signed by Con Form on May 23, 1974 bound the company to subsequent modified Master Labor Agreements executed after the expiration of the 1971–74 MLA in effect at the time the Short Form Agreement was executed. The district court had ruled that Con Form was liable for contributions through April, 1978, when Con Form gave written notice of termination of the Short Form Agreement.

The Court of Appeals affirmed, having construed Articles IIA and IX of the Short Form Agreement as binding Con Form to the provisions of the MLA, supplemental agreements thereto and any renewals or change thereof. The court added, at 1104:

> Additionally, we find Con Form's conduct in continuing to pay the pension trust through December of 1977 and in sending a letter of termination in April of 1978, further evidences the parties intent to be bound by subsequent MLAs unless written notice of termination was given.

In *Arizona Laborers, etc. v. Conquer Cartage Co.*, 753 F.2d 1512 (9th Cir.1985), the Court of Appeals reversed a summary judgment that a termination provision in a Memorandum Agreement (a "me too agreement") executed in 1965 was triggered in 1976 by a one-month gap between the expiration date of the 1973–1976 Master Labor Agreement and the date that the 1976–1979 MLA went into effect.

Conquer Cartage had contributed to the trust funds and honored all other provi-

sions of four MLAs until, in 1981, the trustees requested a payroll audit. At that juncture, the employer contended that it was not then and had not since 1976 been required to contribute to the trust funds.

The trusts sued under the LMRA, 29 U.S.C. § 185 and Section 515 of ERISA, 29 U.S.C. § 1145, to enforce the Memorandum Agreement's provisions requiring the employer to make trust fund contributions. The district court granted the employer's motion for summary judgment.

The Court of Appeals held that summary judgment was improper because there was at least one way in which the termination provisions of the Memorandum Agreement could be construed consistent with the trust funds' claim.

At page 1520, n. 13, the court addressed the adoption question at length, beginning with the following paragraph:

> In view of our holding, we need not reach the issue whether the employer "adopted" the terms of the 1976–79 and 1979–82 Master Labor Agreements. We recognize, however, that a strong argument can be made that the employer, by honoring the terms of the two agreements until 1981, did, in fact, adopt the two agreements.

In *Robbins v. Lynch,* 836 F.2d 330, 31–32 (7th Cir.1988), the court modified and affirmed a judgment in favor of the trustees of two funds suing under ERISA, §§ 502(g)(2) and 515 to recover delinquent contributions. The court held that the employer was bound by a course of conduct to a collective bargaining agreement even though he did not sign it.

In *Gariup v. Birchler Ceiling & Interior Co.,* 777 F.2d 370, 375–76 (7th Cir.1985) the court affirmed a judgment in favor of the trustees of a pension trust fund suing under ERISA, § 502(g)(2) to recover delinquent contributions. In rejecting the employer's argument that the "writing" requirement of LMRA, § 186(c)(5)(B) had not been satisfied, the court declared that a signed, unexpired "collective bargaining agreement" between the parties was not required, but only a "written agreement". The court also adopted the district court's

determination that the employer become a party to the subject agreements through its course of conduct.

In *Central States, Southeast and Southwest Areas Pension Fund v. Gerber Truck Services, Inc.,* 870 F.2d 1148 (7th Cir.1989), the court of appeals held en banc that when the employer and the union submitted documents to the pension fund promising contributions on behalf of all employees but intending to contribute only for several individuals, that arrangement did not defeat the fund's claim under Section 515 of ERISA, 29 U.S.C. § 1145 for the unpaid contributions. The court noted that in so concluding, it followed its own opinion in *Robbins v. Lynch, supra,* and the unanimous view of the other courts of appeals.

The court in *Gerber* said, at 1153 that,

> Whether or not the plans are obligated to Gerber Truck's workers, nothing in ERISA makes the obligation to contribute depend on the existence of a valid collective bargaining agreement; the repudiation of cases such as *McDowell* and *[Washington Area Carpenters' Welfare Fund v.] Overhead Door* [488 F.Supp. 816 (D.C.D.C.1980)] shows the opposite. Section 515 interacts with a provision of the labor laws in a way that strengthens its effects. No employer may agree with a union to contribute to a pension plan without a "written agreement" under § 302(c)(5)(B) of the National Labor Relations Act, 29 U.S.C. § 186(c)(5)(B). This need not be a formal collective bargaining agreement, *Gariup v. Birchler Ceiling & Interior Co.,* 777 F.2d 370, 375 (7th Cir.1985). Local 50 and Gerber signed and sent to the plans a participation agreement, separate from the collective bargaining agreement, in which Gerber promised to contribute on behalf of all of its drivers. Section 302(c)(5)(B), like § 515, prevents a court from giving force to oral understandings between union and employer that contradict the writings. E.g., *Mo–Kan Teamsters Pension Fund v. Creason,* 716 F.2d 772, 777 (10th Cir.1983); *Waggoner v. Dallaire,* 649 F.2d 1362, 1366 (9th Cir.1981). So

ERISA and NLRA work together rather than at cross purposes.

In *Central States, Southeast and Southwest Areas Pension Fund v. Behnke, Inc.,* 883 F.2d 454 (6th Cir.1989), the court of appeals affirmed the district court's determination that the employer was liable under ERISA and the LMRA, to the pension trust fund for unpaid contributions for a period during and beyond the expiration of a 1982–1985 oral collective bargaining agreement.

The employer in *Behnke* contributed to the pension fund from 1950 to 1982 pursuant to a series of collective bargaining agreements. When the 1979–1982 CBA expired on March 31, 1982, negotiations commenced on a new one. Behnke and Local 34 agreed, on an interim basis, to increase its contributions as required to maintain the same level of benefits for its employees for the first year of the contemplated new CBA, and also agreed to pay whatever was required to maintain the plan for the succeeding two years.

The interim agreement was memorialized in a writing, styled "Fringe Benefit Interim Agreement" (Interim Agreement).

> By its terms, this agreement was intended to provide benefit coverage to employees while negotiations for a new CBA proceeded. It became effective on April 1, 1982, and although it had an expiration date of April 1, 1985, it also provided for its earlier termination upon the execution, in final form, of the full CBA.

883 F.2d 457.

In late 1986, Behnke and the union orally agreed on a new CBA, which agreement was never reduced to writing or signed by the parties. Thereafter, Behnke and the union executed a "Participation Agreement".

> That agreement set forth the 1982–83 and 1983–84 contribution rates. More importantly, for our purposes, the agreement also stated that the 1984–85 contribution rate would be whatever rate was necessary to maintain the plan. The Participation Agreement also binds Behnke to the Central States "Trust Agreement," which obligates Behnke to contin-

ue contributions in the amounts specified by the applicable CBA while negotiations proceed for a new CBA. The Participation Agreement also provides for its full force and effect until the employer notifies the fund by certified mail that it is no longer legally obliged to contribute to the fund. Accordingly, Behnke contributed to Central States, and benefits were paid by Central States through April 1984. (footnote omitted).

*Id.*

Behnke argued that the terms of the oral CBA agreed to in late 1982 excused its obligation to contribute to Central States from April 1984 through November 1985, when the contemplated written CBA was finally executed. The pension trust fund argued successfully that the provisions of the oral CBA, relied on by Behnke, were unenforceable as unwritten and accordingly, in violation of the LMRA and ERISA. 883 F.2d at 459.

The court said, at 460,

> Behnke and the Union did, however, execute two written agreements which, as discussed below, evidence Behnke's apparent intent and obligation to make payments to Central States from April 1984 until November 1985. These are the Interim Agreement and the Participation Agreement. The Participation Agreement incorporates by reference the Trust Agreement. Although these writings are not collective bargaining agreements, they sufficiently comport with the writing requirements of LMRA and ERISA at 29 U.S.C. § 186(c)(5)(B) and 29 U.S.C. § 1102(a)(1), respectively, to render Behnke's signed obligation enforceable as written. *See* 29 U.S.C. § 1145, *Gariup,* 777 F.2d at 375.

The *Behnke* decision supports the position of the plaintiff trusts in the case at bar. The Counterpart Agreements between Sandvig–Ostergard and District Council of Painters No. 5 are the substantial equivalent of the written agreements relied upon by the court of appeals in *Behnke.* Furthermore, it is of record here that it was not until April 9, 1987, that Sandvig–Ostergard "determined not to enter· into a new agreement at this time." Sandvig Affidavit, Exhibit L.

The trusts' case here is stronger than in *Behnke*. In *Behnke*, the employer made no contributions on behalf of his employees from April 1, 1984 to November, 1985. Here, the employer made contributions for some but not all of his employees from June, 1986 through March, 1987. NOW, THEREFORE,

IT IS ORDERED, ADJUDGED and DECREED THAT:

(1) The defendant employer's motion for summary judgment on the grounds that the court lacks subject matter jurisdiction of the dispute is hereby DENIED.

(2) This court has subject matter jurisdiction under § 301(a) of the Labor Management Relations Act, 29 U.S.C. § 185(a) and § 502 of the Employee Retirement Income Security Act, 29 U.S.C. § 1132.

(3) The defendant employer's motion for an order awarding Rule 11 sanctions against plaintiff trusts and their attorney "for filing a baseless claim" is hereby DENIED.

(4) There being no genuine issue of material fact, the trusts' motion for judgment as a matter of law as to Sandvig–Ostergard's liability for contributions on behalf of strike placement employees for the period June through December, 1986, is hereby GRANTED.

(5) The defendant employer shall provide forthwith the plaintiffs with the names of their employees and the hours worked by them for the months of January through March, 1987.

(6) Plaintiffs shall thereafter prepare, serve and note for the court's consideration on its regular motions calendar a judgment against the defendant for the unpaid contributions disclosed by the audit, and for unpaid contributions, if any, owing for January through March, 1987, for prejudgment interest, liquidated damages, audit fees, attorney's fees and costs of the action, all as provided under 29 U.S.C. § 1132(g)(2), together with supporting documentation.